**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAFT JONES,<br><br>       Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>       Defendants. | Civil Action No. 18-13943 (GC) (RLS)<br><br>**OPINION**<br><br>**FILED UNDER SEAL** |

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court upon the Motion for Summary Judgment filed by Defendants Officer White, Officer Lt. Decker, Officer Dillon, Officer Harris, and Steven Esposito ("Federal Defendants") (ECF No. 76 ("Motion")). Plaintiff Shaft Jones responded to the Motion (ECF Nos. 79-80, 82-83), and the Federal Defendants filed a reply (ECF No. 81). The Court carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the Motion is **GRANTED**.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## a.  The Summary Judge Record[1]

Plaintiff was housed at the Federal Correctional Institution at Fort Dix, New Jersey ("FCI Fort Dix") from December 8, 2015 through June 15, 2021.  (DSUMF ¶ 3; PSUMF ¶ 3.)  On February 19, and February 20, 2017, he was assigned to the West Compound.  (DSUMF ¶ 4; PSUMF ¶ 4.)

On February 20, 2017, at approximately 9:41 a.m., Plaintiff was seen on a scheduled sick call by Esposito, a mid-level provider ("MLP").  (DSUMF ¶ 5; PSUMF ¶ 5.)  According to the "Clinical Encounter" treatment record or note, Plaintiff said that he had experienced foot and leg pain for months but only reported it at that time because his correctional counselor indicated that the medical department needed to assign him medical shoes and a lower bunk pass.  (DSUMF ¶ 5; ECF No. 77, Ex. A at US_00075 ("Clinical Encounter at US_[]").)  "Plaintiff's unit correctional officer had 'called the inmate in' due to Plaintiff's reports that he could not walk and that his left side 'felt heavy.'"  (DSUMF ¶ 7 (quoting Clinical Encounter at US_00075); *see also* PSUMF ¶ 7 (stating that Officer Peale noted Plaintiff was unable to walk properly and Plaintiff called him in and told the officer he was unable to walk and his left side "felt heavy").)  Esposito further noted a "GSW [Gun Shot Wound] RIGHT foot/left side of body" in 1989 and that Plaintiff "states that he was a Hx [History] of GSW to LEFT side of his body with a shotgun in 1989 & another GSW in 1991."  (Clinical Encounter at US_00075.)

According to the Clinical Encounter, Plaintiff was in no apparent distress, was not short of breath, had a guarded gait, and was observed walking slowly but without any difficulty to his unit

---

[1]      "DSUMF" refers to the Federal Defendants' statement of undisputed material facts at ECF No. 76-2.  "PSUMF" refers to the Plaintiff's amended response to the DSUMF docketed at ECF No. 83.

when released.  (DSUMF ¶ 9; PSUMF ¶ 9.)  He reported aching pain rated at a severity level of 7

and "5+ Years" for the onset date and duration.  (DSUMF ¶ 10; PSUMF ¶ 10.)  In the "ROS"

(Review of Systems) section, Esposito indicated that Plaintiff's neurological complaints were

unremarkable except for abnormal gait and pain.  (Clinical Encounter at US_00076.)  Esposito

also noted ankle pain, foot pain, gait abnormality, hip pain, shoulder pain, and stiffness.  (*Id.*)  In

addition, Plaintiff's vital signs were taken (temperature, pulse, respiration, blood pressure, oxygen

level, height, and weight), and Esposito physically examined Plaintiff's skin, eyes, and pulmonary,

cardiovascular, peripheral vascular, and musculoskeletal systems.   (Clinical Encounter at

US_00076-78.)  The results of the physical examination were normal except for findings of left

tenderness in his shoulders, left guarded gait, and tenderness in his ankle/foot/toes.   (*Id.* at

US_00078.)

Esposito assessed unspecified pain and a history of "*GSW LEFT side of body*" and "*LEFT

Shoulder/hip/leg/foot pain*."  (*Id.*)  He ordered labs and diagnostic studies, including weekly blood

pressure checks, an EKG (to be conducted no later than February 21, 2017), and a blood test and

x-rays (to be conducted by February 22, 2017).  (DSUMF ¶ 12; PSUMF ¶ 12; Clinical Encounter

at US_00075, US_00069-70.)  "[Plaintiff] was advised that only the [the primary care physician]

is authorized to approve of lower bunks, first floors & alternate institutional/soft shoes."  (Clinical

Encounter at US_00075.)  Esposito recommended that Plaintiff obtain Ibuprofen through the

Commissary, and Plaintiff was also told to report to sick call as needed.  (DSUMF ¶ 13; Clinical

Encounter at US_00078-79.)  His next appointment was scheduled for March 1, 2017.  (Clinical

Encounter at US_00079.)

Plaintiff disputes the accuracy of certain aspects of the Clinical Encounter note.  (*See*

PSUMF ¶¶ 6-9, 11-13.)  In a declaration executed under penalty of perjury pursuant to 28 U.S.C.

§ 1746 on May 20, 2024, Plaintiff indicated that, in the morning of February 20, 2017, he complained to Officer Peele about chest pain, numbness in his left leg and arm, and feeling off-balance.  (PSUMF ¶ 7; ECF No. 82-1 ¶ 10 ("Pl. Decl.").)  Peele advised him that medical would be coming to get him, Dillon asked him if he was faking, and he assured Dillon that he was not while stumbling out of the office.  (Pl. Decl. ¶ 8.)  About forty-five minutes later, Esposito arrived and transported Plaintiff to the medical building.  (*Id.*)  Esposito did not help Plaintiff walk even though Plaintiff struggled to keep up because his left leg was dragging.  (*Id.*)  "Defendant Esposito took my blood pressure, asked me questions and performed a limited exam which did not include a neurological exam.  His note for this visit does not contain any indication that such a [neurological] examination occurred."  (*Id.* ¶ 9 (citing Clinical Encounter at US_00077-78); *see also* PSUMF ¶ 11.)

According to Plaintiff's Answers to Defendants' First Set of Interrogatories, Plaintiff complained about numbness and weakness in his left arm and leg, difficulty walking, difficulty speaking, lack of concentration, and dizziness.  (ECF No. 82-1, Ex. B ¶ 16 ("Pl. Answers to Interrogatories").)  In his declaration, Plaintiff denied ever telling Esposito that "my left-sided complaints pertaining to my leg had been ongoing for 'several' months or '5+' years as his contradictory notes reveal."  (Pl. Decl. ¶ 10; *see also* PSUMF ¶ 6.)  He asked Esposito what was wrong, and Esposito said he could not find anything that was wrong with Plaintiff.  (Pl. Decl. ¶ 11; PSUMF ¶ 11.)  Plaintiff told Esposito that he was having a stroke and asked to go to the hospital.  (Pl. Decl. ¶ 11; PSUMF ¶ 11.)  Esposito refused to send him to the hospital, telling him he just needed to rest, buy some Ibuprofen, and should return to his room.  (Pl. Decl. ¶ 11; PSUMF ¶ 11.)  Plaintiff further states that he rated his pain at a 7 and that Esposito ordered labs and diagnostic studies; but he denies that he was in no apparent distress, was able to walk without

4

difficulty, or that Esposito told him to report to sick call as needed.  (PSUMF ¶¶ 9-10, 12-13; Pl. Decl. ¶¶ 8-11.)

The Daily Lieutenant Log for February 20, 2017, stated that, at 9:10 a.m., around the time that Plaintiff was in the infirmary, a mass shakedown was conducted of Plaintiff's housing unit (Housing Unit 5811), with all inmates in the unit moved to the recreation unit during the search. (DSUMF ¶¶ 14-15; PSUMF ¶¶ 14-15.)  In a handwritten document signed on March 21, 2017, Plaintiff certified under penalty of perjury pursuant to 28 U.S.C. § 1746 that Dillon instructed him to proceed to the gymnasium where the other inmates in his unit were confined.  (ECF No. 82-1, Ex. A at 5 ("Pl. Certif.").)  Purportedly, despite his complaints of pain and his inability to properly move his left leg, Dillon ordered him to keep walking, told him he was faking, and said it did not look like anything was wrong with him.  (Pl. Answers to Interrogatories ¶ 15.)

According to the Daily Assignment Roster, none of the Federal Defendants were working in Housing Unit 5811 or the West Compound of FCI Fort Dix on February 19, 2017; however, they were working in the unit or compound during the evening shift on February 20, 2017. (DSUMF ¶¶ 16-17.)  In his declaration, Plaintiff stated the following: "[I]t is my recollection and belief that defendant Harris came to my room on February 19, 2017," but, "regardless of the date," Harris "came to my room during the evening shift as I was experiencing confusion, left-sided weakness, . . . was unable to move my left arm or leg[,] . . . was unable to speak clearly or communicate with ease[,] . . . could not move the left side of my body, it felt weak, and I had some tightness in my chest."  (Pl. Decl. ¶ 3.)  Harris told Plaintiff to let him know if things worsened. (*Id.*)

Plaintiff claimed that, subsequently, Plaintiff's roommates retrieved Harris, who reported the situation to the compound officers (Decker, White, and a third officer).  (*Id.* ¶ 4.)  "As stated

in my prior Affidavit," Decker and White had him sit up in his bed and asked him to lift his arms up over his head.  (*Id.* ¶ 5.)  He was unable to do so on his own, the officers lifted his arms up and the left arm dropped because he could not support it.  (*Id.*)  He was also unable to squeeze one of their hands with full strength, and, although he struggled with his words, Plaintiff told the officers that the left side of his body was weak and he could not control it.  (*Id.*)  Decker and White responded that he "would be alright and just needed some rest."  (*Id.*)  However, Plaintiff and other inmates "emotionally reacted" to their response, voicing their concerns that he was having a stroke and needed to be taken to the hospital.  (*Id.* ¶ 6.)  "Defendant Decker responded I was not having a stroke, it was probably Bell's Palsy" because "one of his relatives had it."  (*Id.*)  Decker told him to lay down and take Motrin.  (*Id.*)

According to Plaintiff, Harris subsequently returned to his room before the end of the evening shift, told Plaintiff that he did everything he could to help Plaintiff, and said he was "sorry but the Compound Officers made a decision not to call medical or the Lieutenant."  (*Id.* ¶ 7.)  Plaintiff asked Harris to make the call, but he said his "hands were tied."  (*Id.*)  Harris said he would let the officers on the next shift know to keep their eyes on Plaintiff.  (*Id.*)  As the night progressed, Plaintiff could not get himself to the bathroom and needed assistance from other inmates on two occasions.  (*Id.*)

Plaintiff admits that the unit log includes the following entry for February 20, 2017:

> At 10:44 p.m. a cellmate of inmate Jones came to the office and stated that inmate Jones was complaining of chest pains and that he couldn't move.  Once we arrived to his room, inmate Jones was conscious and was later able to move his body.  The LT was notified and the message was relayed to the doctor.

(PSUMF ¶ 18.)  He also acknowledges that, under the institution's policy, medical staff are not on duty in the late evening, and the Lieutenant contacts the on-call medical provider when he or she

6

receives a medical complaint.  (*Id.* ¶ 19; DSUMF ¶ 19.)  The decision whether to send Plaintiff to the hospital would then have been made by the physician.  (DSUMF ¶ 19.)  Plaintiff disputes the accuracy of the log entry and whether the policy was followed based on his account of his symptoms and interactions with Harris, Decker, and White.  (PSUMF ¶¶ 18-19.)

On February 23, 2017, at approximately 7:38 p.m., an emergency medical technician responded to an announced medical emergency in Housing Unit 5811 and found Plaintiff unconscious.  (DSUMF ¶ 20; PSUMF ¶ 20.)  The on-call physician was contacted, and Plaintiff was taken to the local hospital by ambulance for further evaluation.  (DSUMF ¶ 21; PSUMF ¶ 21.)  From February 23, 2017, through February 28, 2017, he was treated at the hospital and underwent radiology studies, including EEG, MRI, and CT scans.  (DSUMF ¶ 22; PSUMF ¶ 22.)  He was diagnosed with multiple acute embolic strokes.  (DSUMF ¶ 22; PSUMF ¶ 22.)

### b.  Procedural History

Proceeding pro se, Plaintiff filed his initial Complaint on or about September 26, 2019.  (ECF Nos. 1-2.)  His Amended Complaint was filed on September 30, 2019.  (ECF No. 9 ("Amended Complaint").)  On March 16, 2020, the Honorable Robert B. Kugler, U.S.D.J., screened the Amended Complaint and allowed Plaintiff's Eighth Amendment deliberate indifference and related state law claims against the Federal Defendants to proceed.  *Jones v. United States*, Civ. No. 18-13943, 2020 WL 123916 (D.N.J. Mar. 16, 2020).  On June 3, 2022, Judge Kugler denied without prejudice the Federal Defendants' motion to dismiss, or, in the alternative, for summary judgment.  *Jones v. United States*, Civ. No. 18-13943, 2022 WL 1830777 (D.N.J. June 3, 2022).  The Court explained that the Federal Defendants' arguments were premature.  *Id.* at *7.  "Defendants rely on prison records as well as Plaintiff's medical records on their motion which were not attached to the amended complaint.  Thus, their arguments cannot be

considered as part of a motion to dismiss." *Id.*  The Court further determined that Plaintiff should be afforded the right to discovery before ruling on the merits of the Federal Defendants' motion for summary judgment.  *Id.* at *7-8.

On January 26, 2023, Judge Kugler granted Plaintiff's motion to appoint pro bono counsel (ECF No. 56), and Plaintiff's counsel was appointed on February 7, 2023 (ECF No. 57).  The Federal Defendants moved for summary judgment on April 18, 2024.  (ECF No. 76.)  On May 20, 2024, Plaintiff filed his opposition to the Motion.  (ECF Nos. 79, 82.)  The Federal Defendants replied on May 28, 2024.  (ECF No. 81.)  On May 29, 2024, Plaintiff resubmitted Plaintiff's declaration and the attached exhibits, including a legible copy of his prior certification.  (ECF No. 82.)  On May 30, 2024, Plaintiff filed, with the consent of the Federal Defendants, an amended response to the Moving Defendants' statement of material facts, which contained supporting citations to record evidence.  (ECF No. 83.)  On June 21, 2024, this matter was reassigned to the undersigned.  (ECF Nos. 85-86.)

## II.    **LEGAL STANDARD**

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted); Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (internal citation omitted). The moving party may also meet its burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted)

## III.    <u>DISCUSSION</u>

Plaintiff claims that the Federal Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  The Federal Defendants argue that they are entitled to immunity under both prongs of the qualified immunity doctrine.  (ECF No. 76-1 at 10-22; ECF No. 81 at 4-7.)  The Court agrees with the Federal Defendants that, as to the Eighth Amendment claims against Esposito, a medical professional who treated Plaintiff, and Dillon, a correctional officer who escorted Plaintiff after he was seen by Esposito, Plaintiff has failed to present facts showing a violation of his constitutional rights under the first prong.  As to Harris, Decker, and White, the Court concludes that they have not violated a clearly established right pursuant to the second prong of the doctrine.[2]

### a.    Step One of the Qualified Immunity Doctrine and Deliberate Indifference to Serious Medical Needs

The two-prong test for qualified immunity considers whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right and whether that right was clearly established at the time of the alleged violation.  *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (To overcome a claim of qualified immunity, a plaintiff must show: "(1) that the official violated a statutory or constitutional right,

---

[2]      The Federal Defendants also argue that "[t]o the extent that the Amended Complaint raises 'state law claims' against the Federal Defendants sounding in tort, Plaintiff was obligated to bring those claims against the United States under the Federal Tort Claims Act.  28 U.S.C. §§ 1346(b), 2679(b)(1)."  (ECF No. 76-1 at 7 n.1.)  "However, the Court has already ruled that Plaintiff did not exhaust his administrative remedies under the FTCA before bringing this action."  (*Id.* (citing *Jones*, 2020 WL 1243916, at *3-4).)  Plaintiff does not respond to this argument, and the Court agrees that the Federal Defendants are entitled to summary judgment on any state law claims against them.  *See Jones*, 2020 WL 1243916, at *3 ("An incarcerated FTCA plaintiff may sue only the United States, may seek only monetary damages, and may not recover for mental or emotional damages in the absence of physical injury.  *See* 28 U.S.C. § 1346(b)(1)-(2); *CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008) ("The Government is the only proper defendant in a case brought under the FTCA.").").

and (2) that the right was clearly established at the time of the challenged conduct." (cleaned up));

*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful.").

"[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment. *Id.* (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)). Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *See* 555 U.S. 223, 236 (2009).

The Federal Defendants argue that they are entitled to qualified immunity under both prongs. (ECF No. 76-1 at 10-22.) Under the first prong, they contend that there is no evidentiary support for Plaintiff's Eighth Amendment claims for deliberate indifference to his serious medical needs. (*Id.* at 11-20.) The Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend VIII. Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must also "take reasonable measures to guarantee the safety of . . . inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (citing *Farmer*, 511 U.S. at 832). The Supreme Court first held in *Estelle v. Gamble* that the Cruel and Unusual Punishments Clause prohibits government officials from exhibiting "deliberate indifference to [the] serious medical needs of prisoners." 429 U.S. 97, 104-05 (1976). The *Estelle* Court recognized the obligation to provide medical care for those whom [the state] is punishing by incarceration," because "the prisoner . . . cannot by reason of the deprivation of his liberty . . . care for himself." 429 U.S. at 103 (citation

omitted).  The Court observed that the denial of medical care to prisoners "denies them their dignity and does not comport with standards of decency."  *Id.*  "In the worst cases," denial of medical care may "produce physical torture or a lingering death" and, "[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency."  *Id.*

In *Farmer v. Brennan*, the Court clarified that "a prison official violates the Eighth Amendment only when two requirements are met."  511 U.S. at 834.  *First*, "the deprivation alleged must be, objectively, 'sufficiently serious.'"  *Id.* (citation omitted).  *Second*, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind'—i.e., "deliberate indifference."  *Id.* (citations omitted).  Thus, in order to sustain an Eighth Amendment claim under 42 U.S.C. § 1983, a plaintiff must make (1) an objective showing that "those needs were serious" and (2) a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).  In addition, even a "prison official[ ] who actually knew of a substantial risk to inmate health or safety may be found free of liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  That is, a "prison official[ ] who act[s] reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."  *Id.* at 845.

To act with deliberate indifference to a serious medical need is to recklessly disregard "a substantial risk of serious harm."  *Id.* at 839.  It is well established that deliberate indifference may be shown by "intentionally denying or delaying medical care."  *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (quoting *Estelle*, 429 U.S. at 104).  "The question under the Eighth Amendment

is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'"[3] *Id.* (quoting *Farmer*, 511 U.S. at 843).

There is "a critical distinction" between claims based on inadequate medical care and claims based on intentional denial or delay of medical care. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (explaining that the court has "found deliberate indifference in situations where necessary medical treatment is delayed for non-medical reasons" (cleaned up)). In cases where a prisoner challenges the adequacy of medical care, "mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation." *Pearson*, 850 F.3d at 535. (internal quotation and citation omitted). In such cases, courts presume that the medical care provided to the plaintiff was adequate, and the plaintiff must show that the medical provider did not exercise professional judgment. *See id.* at 536. Furthermore, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Id.* at 535 (citing *Durmer v. O'Connell*, 991 F.2d 64, 69 n.13 (3d Cir. 1993)). Mere medical malpractice cannot give rise to an Eighth Amendment violation. *See White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990).

Accordingly, there are two "very distinct subcomponents" to the deliberate indifference prong in the context of an inadequate care claim: (1) the adequacy of the medical care, which is

---

[3]     The parties do not dispute that Plaintiff's medical need was serious. *See Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (stating that the "seriousness" prong requires a plaintiff to demonstrate that the need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention" and, at the other end of the spectrum, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious").

"an objective inquiry where expert testimony could be helpful to the jury;" and (2) the defendant's state of mind, which implicates "a subjective inquiry that can be proven circumstantially without expert testimony." *Pearson*, 850 F.3d at 535-36. Medical expert testimony may be necessary where, as laypersons, the jury would not be in a position to determine whether a particular treatment or diagnosis fell below the professional standard of care. *Id.* at 536. According to the Third Circuit:

> As is the case with evaluating whether the prisoner is suffering from a serious medical need, evaluating whether medical treatment is adequate presents an objective question typically beyond the competence of a non-medical professional. Likewise, it makes sense to require a prisoner to offer extrinsic proof regarding the quality of medical care in adequacy of care cases when, to defeat our presumption that the medical care provided to him or her was adequate, the prisoner must show that the medical official did not exercise professional judgment. *See, e.g.*, [*Celotex*, 477 U.S. at 331] (holding that when the burden of persuasion at trial would be on the nonmoving party, "the party moving for summary judgment may satisfy Rule 56" by demonstrating that "the nonmoving party's evidence is insufficient to establish an essential element of [its] claim"); *Durmer*, 991 F.2d at 67 ("[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."); [*Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)] ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

*Id.* at 536. Expert evidence is not always required where other forms of "extrinsic proof" may suffice. *Id.* In *Pearson v. Prison Health Serv.*, the Third Circuit explained that "Pearson has not offered any extrinsic proof regarding the quality of medical care, and it may well be possible that other forms of extrinsic proof (e.g., a training manual, photograph, or medical records) could have permitted a reasonable jury to find that his medical care was inadequate." *Id.* Extrinsic evidence, in turn, is not necessary if it would be obvious to a layperson that the defendant breached a professional standard of care. *Id.*

14

In contrast, "a delay or denial of medical treatment claim must be approached differently than an adequacy of care claim," and "there is no presumption that the defendant acted properly." *Id.* at 537. "[T]he deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Id.* To survive summary judgment in such a case, "[a]ll that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

With respect to the "subjective" inquiry applicable to both types of claims, the plaintiff does not need to provide direct evidence that a defendant had the requisite state of mind:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Cf.* [1 W.] LaFave & [A.] Scott, [Substantive Criminal Law] § 3.7, p. 335 [(1996)] ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of").

*Farmer*, 511 U.S. at 842-43 (some internal citations omitted). "Deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535.

Finally, non-medical personnel "are entitled to presume the competence of medical staff in treating a prisoner, meaning that [their] conduct cannot, without much more, amount to 'deliberate indifference.'" *Bearam v. Wigen*, 542 F. App'x 91, 92 (3d Cir. 2013) (per curiam) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). "[A]bsent a reason to believe (or actual knowledge)

that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236.  However, "even when an inmate is under the care of medical experts . . ., his condition might be so dire and obvious that [a non-medical prison official's] failure to summon immediate medication attention . . . amount[s] to deliberate indifference." *Dinsmore v. Cnty of Butler*, Civ. No. 16-00752, 2017 WL 413072, at *3 (W.D. Pa. Jan. 31, 2017) (quoting *Spruill*, 372 F.3d at 237).

### i.  The Inadequacy Claim Against Esposito

Plaintiff argues that, "with respect to defendant Esposito, he alleges this defendant's response to plaintiff's medical needs was so egregious, it amounted to deliberate indifference." (ECF No. 79 at 9.)  Recognizing that mere negligence is insufficient, he asserts that there is a factual dispute as to whether Esposito disregarded complaints (i.e., left-sided weakness, confusion, and difficulty in communication) that even laypersons would reasonably recognize as signs and symptoms of a stroke requiring evaluation by a physician at a hospital or an emergency room.  (*Id.* at 10.)  Instead, Esposito purportedly "raised a false 25 year history of a gunshot wound to plaintiff's 'left' leg/foot to justify his complete and utter failure to obtain an accurate medical history, conduct a neurological examination or undertake any assessment or diagnostic test to determine if plaintiff was experiencing a stroke."  (*Id.*)  Plaintiff claims that Esposito knew there was a potential risk of a stroke because Plaintiff informed the medical care provider that he believed he was experiencing a stroke and yet took no measures to assess him for that condition or refer him to a doctor or emergency care.  (*Id.*)  According to Plaintiff, "Defendant Esposito denied plaintiff's reasonable requests for medical treatment and thereby exposed him to 'undue suffering or the threat of tangible residual injury.[']  As such, deliberate indifference is manifest."

(*Id.* (quoting *Lanzaro*, 834 F.2d at 346; *Robinson v. Moreland*, 655 F.2d 887, 889-90 (8th Cir. 1981)).)

It is undisputed that Esposito examined, diagnosed, and treated Plaintiff. (*See, e.g.*, Clinical Encounter at US_00075-80; Pl. Decl. ¶¶ 9-11.) Plaintiff instead challenges the adequacy of the examination performed and the treatment provided by this health care provider. As evidentiary support for his inadequacy claim, he relies on his May 20, 2024 declaration, his prior handwritten certification dated March 21, 2017, and Plaintiff's Answers to Defendants' First Set of Interrogatories. (*See* ECF No. 82.)

The Federal Defendants indicate that the Court should disregard the declaration and other documents submitted by Plaintiff. They note that conclusory and self-serving affidavits are insufficient to withstand a motion for summary judgment, that the removal of a factual question from the hands of the jury is appropriate when a plaintiff has nothing more than his own self-serving and uncorroborated account, and that a party's unsupported and uncorroborated factual assertions, which are contradicted by the record, must be disregarded. (ECF No. 81 at 2-3 (citing *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012); *McCarthy v. Int'l Ass'n of Machinists & Aerospace Workers*, Civ. No. 21-1673, 2021 WL 5766569, at *4 (3d Cir. 2021); *Scott v. Harris*, 550 U.S. 372, 380 (2007)).)

However, under Rule 56, "the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Paladino v. Newsome*, 885 F.3d 203, 209-10 (3d Cir. 2018) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 241 (3d Cir. 2018)). "Even if the information is self-serving, 'a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment.'" *Miller v. Berrios*, Civ. No. 21-9912, 2023 WL 3452623, at *3 (D.N.J. May 15, 2023)

(quoting *Paladino*, 885 F.3d at 209); *see also Callway v. N.J. State Police Troop A*, Civ. No. 12-5477, 2018 WL 2980387, at *4 (D.N.J. June 14, 2018) (stating that investigation reports, "in and of themselves, do not 'blatantly contradict [ ]' Plaintiff's version of events such that 'no reasonable jury could believe his testimony.'" (quoting *Scott*, 550 U.S. at 380)); *Jordan v. Cicchi*, Civ. No. 10-4398, 2014 WL 2009089, at *2 (D.N.J. May 16, 2014) ("However, "the issue is not whether Plaintiff has relied solely on his own testimony to challenge [a summary judgment motion], but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature.'" (citing *Johnson v. MetLife Bank, N.A.,* 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012)), *aff'd*, 167 F. App'x 153 (3d Cir. 2015). Plaintiff's factual assertions regarding what he told Esposito during the examination and the other circumstances of the examination are not conclusory in nature and, in fact, some of them are corroborated by Esposito's treatment note. For instance, Plaintiff accurately noted that the medical record "does not contain any indication that [a neurological examination] occurred."[4] (Pl. Decl. ¶ 9 (citing Clinical Encounter at US_00078-79).) The Clinical Encounter also noted "GSW RIGHT foot/LEFT side of body." (Clinical Encounter at US_00075; *see also* Pl. Decl. ¶ 10.)

Nonetheless, the Court agrees with the Federal Defendants that Plaintiff has failed to present sufficient evidence to satisfy the subjective element of an inadequate care claim.[5] Even if

---

[4]      The Federal Defendants also state in their reply that the filed copy of Plaintiff's seven-year-old "affidavit" is illegible and "Plaintiff's response to the Federal Defendants' statement of material facts not in dispute does not contain any citations, which is contrary to Local Civil Rule 56.1(a)'s requirement." (ECF No. 81 at 4 (citing PSUMF).) However, Plaintiff submitted a legible copy of the certification the day after the reply brief was filed (ECF No. 82), and the Federal Defendants have not raised any objection to the Court's consideration of this submission. With the Federal Defendants' consent, he also filed a corrected response to the statement of material facts with requisite citations. (ECF No. 83.)

[5]      In their reply brief, the Federal Defendants note that, in *Gambino v. Cassano*, Civ. No. 17-0830, 2022 WL 4536469 (D.N.J. Sept. 28, 2022), the court held that the plaintiff (a Fort Dix inmate who brought deliberate indifference claims for allegedly inadequate treatment of his acute

a reasonable juror could credit Plaintiff's assertions that he told Esposito that he believed he was having a stroke and complained about left-sided weakness, confusion, and difficulty in communication, he has failed to present sufficient evidence that Esposito "also act[ed] with the requisite state of mind when providing that inadequate care." *Pearson*, 850 F.3d at 535 (citing *Durmer*, 991 F.2d at 69 n.13).

Plaintiff contends that Esposito was "reckless in his interactions" with him, and Esposito's deliberate indifference was "manifest," because he failed to evaluate Plaintiff for a stroke or refer him to a doctor or emergency care even though Esposito "knew this was a potential risk" given Plaintiff's statement that he believed he was suffering a stroke and Plaintiff's disregarded complaints were obvious symptoms of a stroke, and he instead relied on a "false 25 year history of a gunshot wound to plaintiff's 'left' leg/foot." (ECF No. 79 at 10.)  However, as the Federal Defendants note, Plaintiff does not claim that Esposito knew of any preexisting underlying condition that caused Plaintiff's stroke and refused to treat it. (ECF No. 76-1 at 15.)  In fact, Plaintiff does not indicate that "he previously suffered from these symptoms or had a medical history that would suggest he was prone to suffering a stroke." *Aul v. Correct Care Solutions*, Civ. No. 18-02142, 2021 WL 18377571, at *5 (M.D. Pa. May 7, 2021) (dismissing plaintiff's deliberate indifference claim against nurse who allegedly did not perform additional tests, ignored

---

infections) failed to raise a genuine issue of material fact because the record "lacked 'extrinsic proof' that the medical care the plaintiff received was inadequate and the 'plaintiff's personal opinion that the Fort Dix medical staff falsified the properties, size, and condition of his wound [w]as not supported by evidence in the record." (ECF No. 81 at 3-4 (quoting *Gambino*, 2022 WL 4536469, at *7, 11)); *see also McFadden v. Dalmasi*, 837 F. App'x 136, 137 n.6 (3d Cir. 2020) (per curiam) (upholding the district court's rejection of the plaintiff's argument that extrinsic evidence was not required because "any layperson would know that a 'head injury' is a serious medical condition requiring 'emergent' [as opposed to 'urgent'] care").  Because Plaintiff's claim fails under the subjective prong, the Court need not (and does not) decide whether Plaintiff has presented the requisite extrinsic evidence regarding the "quality of medical care" under the objective prong, or whether extrinsic evidence is not necessary because it would be obvious to a layperson that Esposito breached professional standards of care. *See Pearson*, 850 F.3d at 536.

presentation of stroke symptoms, diagnosed ocular strain, prescribed Ibuprofen, and told plaintiff to take it easy).

Furthermore, even though Plaintiff disputes its accuracy, Esposito conducted a full ROS, including any complaints Plaintiff reported concerning his eyes and musculoskeletal and neurological systems. (Clinical Encounter at US_00075-76.) In this review, he specifically acknowledged that Plaintiff reported an abnormal gait, stiffness, and pain. (*Id.* at US_00076.) Esposito also considered Plaintiff's prior (and undisputed) history of a gunshot wound to the left leg (not his left foot) and took Plaintiff's blood pressure, pulse, oxygen level, and respiration rate. (*Id.* at US_00076-77.) The Clinical Encounter documented that Esposito physically examined Plaintiff's eyes, pulmonary, cardiovascular, and musculoskeletal systems. (*Id.* at US_00077-78.) The findings were normal except for tenderness in the left shoulder, a guarded left gait, and tenderness in the ankle/foot/toes. (*Id.*) Esposito assessed unspecified pain, directed Plaintiff to begin taking Ibuprofen, and ordered additional testing to be performed within one or two days (i.e., a blood test, x-rays, an EKG) together with weekly blood pressure checks (and he was scheduled to see an MLP approximately one week later). (*Id.* at US_00078-79.)

As the Third Circuit has recognized (in a non-precedential opinion), "[w]ithout more, the decision not to order additional diagnostic tests will not constitute deliberate indifference, as it suggests mere negligence." *Bearam*, 542 F. App'x at 93 (citing *Estelle*, 429 U.S. at 106). The *Bearam* court noted that a claim that the doctor refused to acknowledge the plaintiff's tumors did not constitute a substitute for a plausible allegation that the physician knew tumors existed and refused to treat them. *Id.* "Here, we have instead an allegation that Dr. Cutler performed some investigation [at least ordering a blood test] and determined that Bearem does not have the condition he thinks he has; while Dr. Cutler could conceivably be wrong, he cannot consciously

disregard a risk he has found reason to believe does not exist." *Id.*   Likewise, in *Aul*, the plaintiff suggested that a nurse "missed physical findings of his stroke due to her failure to conduct 'any other tests,'" but the United States District Court for the Western District of Pennsylvania concluded that "this again asserts negligence on her part, no deliberate indifference."  *Aul*, 2021 WL 1837571, at *6 (citations omitted)).   Similarly, Esposito performed at least "some investigation" and, according to Plaintiff, indicated that he "does not have the condition he thinks he has" and "missed [complaints] and physical findings of his stroke."

The Court thereby finds that Plaintiff has failed to satisfy the subjective component of his deliberate indifference claim against Esposito.  *See Foreman v. Elam*, 796 F. App'x 529, 531-32 (10th Cir. 2019) ("Foreman's claim against Elam apparently is based on her failure to immediately treat him for a stroke on the morning of April 27.   But the complaint establishes that Elam examined Foreman, even if only briefly, that his vital signs were good, and that she did not believe he had suffered a stroke.    Thus, Elam did not completely deny care or demonstrate 'an extraordinary degree of neglect.'" (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)); *Mitchell v. St. Louis Cnty.*, Civ. No. 23-000223, 2024 WL 1674521, at *5 (W.D. Mo. Apr. 18, 2024) ("In sum, based on the facts pleaded in the Third Amended Complaint, it is not plausible that any of these Defendants actually *knew* Decedent was having a stroke—or some other serious medical event—and provided 'intentional maltreatment' or otherwise 'refus[ed] to provide essential care.'   Though perhaps some of the medical decisions were unreasonable or violated standards of care under state law, these Defendants' treatment of Decedent 'd[id] not represent cruel and unusual punishment.'" (emphasis in original)), *appeal filed*, (8th Cir. Aug. 5, 2024).

Accordingly, the Court concludes that the Federal Defendants are entitled to summary judgment as to the Eighth Amendment claim against Esposito.

### ii.  The Denial or Delay of Medical Care Claim Against Dillon

As the Court has explained (*see supra* Section III.a.), there is "a critical distinction" between claims based on inadequate medical care and claims based on intentional denial or delay of medical care.  *See Pearson*, 850 F.3d at 535 (quoting *Walker*, 599 F.2d at 575 n.2).  "Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry."  *Id.* at 537.  However, unlike Esposito, Dillon is not a medical provider, and non-medical personnel "are entitled to presume the competence of medical staff in treating a prisoner, meaning that [their] conduct cannot, without much more, amount to 'deliberate indifference.'"  *Bearam*, 542 F. App'x at 92 (quoting *Spruill*, 372 F.3d at 236).  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  *Spruill*, 372 F.3d at 236.

According to Plaintiff, Dillon observed his left-sided weakness and inability to move normally, and he told her that he was suffering.  (ECF No. 79 at 12.)  Plaintiff asserts that Dillon failed to seek medical care for Plaintiff, "and, adding insult to deliberate indifference, accused him of faking."  (*Id.*)  The Federal Defendants properly note that Dillon was merely escorting Plaintiff from the infirmary after he was examined by medical staff, and there is no evidence that she was instructed by Esposito that Plaintiff was incapable of walking to rejoin his unit in the gymnasium while their housing unit was being searched.  (ECF No. 76-1 at 19 (citing SUMF ¶¶ 7-14).)  With respect to the officer's disparaging remark, it fails to "rise to the level of intentional maliciousness or wantonness required to state a violation of the Eighth Amendment."  *Robertson v. Gilmore*, 850

F App'x 833, 837 (3d Cir. 2021) ("And Robertson's allegations that Santos and Hice disparaged his physical therapist's opinion and were hostile toward him do not rise to the level of intentional maliciousness or wantonness required to state a violation of the Eighth Amendment. *See Spruill*, 372 F.3d at 237.").

Accordingly, the Court concludes that the Federal Defendants are entitled to summary judgment as to the Eighth Amendment claim against Dillon.

### b.  Step Two of the Qualified Immunity Doctrine

With respect to the three other non-medical Defendants (Harris, Decker, and White), the Federal Defendants argue that they were entitled to rely on the opinions of medical staff who were already treating Plaintiff and that they had no reason to believe that the medical staff was mistreating or not treating Plaintiff.[6]  (*Id.* at 17 (citing DSUMF ¶¶ 18-19).)  The Federal Defendants further argue that Plaintiff alleged that he was sent to medical in the morning, and "courts have found much longer delays nonactionable, even under circumstances where the inmate was not already under medical observation."  (*Id.* at 18 (citing *Spruill*, 372 F.3d at 236-37; *Phillips v. Rustin*, Civ. No. 06-1338, 2009 WL 1688466, at *7 (W.D. Pa. June 17, 2009); *Ferguson v. Cape Girardeau Cnty.*, 883 F. Supp. 431, 433-34 (E.D. Mo. 1995), *aff'd in part & remanded in part on other grounds*, 88 F.3d 647 (8th Cir. 1996); *Black v. Lynn*, Civ. No. 85-8515, 1989 WL 88478, at *4 (N.D. Ill. Aug. 1, 1989)).)  According to Plaintiff, his sworn statements show that "his left-

---

[6]      The Daily Assignment Roster demonstrates that Harris, Decker, and White were working on the evening shift on February 20, 2017, after Plaintiff was seen by Esposito.  (DSUMF ¶¶ 16-17), and, in his opposition brief, Plaintiff "[a]ssumes for the purposes of this motion [that] defendants Harris, White, and Decker responded to [the] calls for help on February 20, 2017."  (ECF No. 79 at 11; *see also id.* at 2, 4 (describing alleged accounts of what occurred "[o]n or about February 19, 2017" and "[o]n or about February 20th, 2017"); Pl. Decl. ¶ 3 (stating his "recollection and belief that" Harris came to his room on February 19, 2017, but then qualifying his summary of the interactions with "regardless of the date.").)

sided weakness, inability to move, and difficulty responding verbally to questions, were not only observable by these defendants but were communicated to them by plaintiff" and that Plaintiff and other inmates "excitedly reacted" to the officers' refusal to seek medical care by imploring them to take him to the hospital as it was apparent he was possibly suffering a stroke.  (ECF No. 79 at 11-12.)  Plaintiff further notes that Harris subsequently acknowledged that the compound officers decided not to call medical, and, when he was asked to make the call, Harris said his hands were tied.[7]  (*Id.* at 12.)

Although Plaintiff was being treated and the correctional officers had no reason to believe that medical personnel were mistreating (or not treating) him, it is well established that, "[e]ven when an inmate is under the care of medical experts . . ., his condition might be so dire and obvious that [a non-medical prison official's] failure to summon immediate medication attention . . . amount[s] to deliberate indifference."  *Dinsmore*, 2017 WL 413072, at *3 (quoting *Spruill*, 372 F.3d at 237); *see also Rossman v. Primecare Med. Inc.*, Civ. No. 21-00703, 2022 WL 1019991, at

---

[7]        The Federal Defendants also argue in their reply brief that, according to the unit log entry, the Lieutenant on duty was notified of Plaintiff's medical complaints and the message was relayed to the doctor.  (ECF No. 81 at 5-6; *see also* PSUMF ¶ 18 (acknowledging that log includes this entry)).  They assert that the Plaintiff does not dispute the authenticity of the entry or offer any evidence of its inaccuracy beyond his own declaration.  (*Id.*)  But, according to Plaintiff's declaration, Decker and White told him he would be alright and just needed to rest; when Plaintiff and other inmates vehemently raised their concern that Plaintiff was having a stroke and needed to be taken to the hospital, Decker denied it was a stroke, claiming it was probably Bell's Palsy, and he should lay down, take some Motrin, and rest; and Harris returned to his room before he left for the night, told him he did everything he could to help him, "he was sorry but the Compound Officers made a decision not to call medical or the Lieutenant," and when "I asked him to make this call and he said he could not, his hands were tied."  (Pl. Decl. ¶¶ 3-7.)  Plaintiff's account is sufficient to raise a triable issue of fact as to whether the officers contacted medical personnel during their night shift.  *See Miller*, 2023 WL 3452623, at *3 ("Even if the information is self-serving, 'a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment.'" (quoting *Paladino*, 885 F.3d at 209)); *Callway*, 2018 WL 2980387, at *4 (stating that investigation reports in and of themselves did not blatantly contradict Plaintiff's version of events and that it was not for the court to weigh the evidence or assess credibility).

*4 & n.57 (M.D. Pa. Apr. 5, 2022) (same).  The Court does not decide whether the facts, as viewed in the light most favorable to Plaintiff, show a constitutional violation of a constitutional right under this "*Spruill* exception" because the right was not clearly established at the time of the allegation violation.  *Dinsmore*, 2017 WL 413072, at *3; *see also Pearson*, 555 U.S. at 226 (stating that qualified immunity prongs need not be addressed in sequence).

Qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments."  *Id.* at 818.  In order for the right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741; *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  Courts "typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional." *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818-19.

In 1976, the Supreme Court first recognized "the government's obligation to provide medical care for those whom it is punishing by incarceration."  *Estelle*, 429 U.S. at 103; *see id.* at 101, 108 (affirming dismissal of deliberate indifference claims against medical providers but "remand[ing] the case to the Court of Appeals to allow it an opportunity to consider . . . whether a cause of action has been stated against the other prison officials" based on their refusal to provide care for the prisoner's medical needs, which included chest pains).  "[A]n inmate with a potentially

serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury" is "the prototypical case of deliberate indifference." *Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998).

"[T]he right must be defined beyond a high level of generality." *Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). But, there need not be "a case directly on point for a right to be clearly established." *Id.* (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021)). That is, "it is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity. Instead, a clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Russell v. Lumitap*, 31 F.4th 729, 737-38 (9th Cir. 2022) (quotations and citations omitted).

The Federal Defendants define the right at issue here as follows: "He [the prisoner] receives medical treatment in the morning but does not immediately receive additional medical treatment in the evening after complaining to non-medical staff." (ECF No. 76-1 at 21.) Although Plaintiff does not respond to this definition or offer his own formulation, the Court finds that the Federal Defendants' formulation does not adequately incorporate Plaintiff's specific account of what happened when he was seen by the three officers. Construing the facts in the light most favorable to Plaintiff, the Court defines the right at issue as follows as to the three Defendants. For Harris, who saw Plaintiff on three separate occasions during the evening shift on February 20, 2017, the Court defines the right as follows:

> When a correctional officer is aware that a prisoner being treated by medical staff is experiencing a stroke or other obviously dire medical crisis with well-known symptoms requiring immediate medical attention where: the prisoner and other inmates said he had

26

the symptoms of a stroke and needed to be taken to the hospital; the prisoner exhibited well-known symptoms of a stroke (e.g., confusion, difficulty speaking, and left-sided weakness such as an inability to lift his left arm up over his head and keep it up without assistance and an inability to squeeze a hand at full strength); the officer heard the compound officers say the prisoner would be alright, should rest, and take over-the-counter pain medication and one of the compound officers told the prisoner he was not having a stroke but probably had Bell's Palsy, which the compound officer knew because a relative had the same condition; and the officer then returned alone to tell the prisoner that he did everything he could to help and was sorry, but the compound officers decided not to call the medical department or the Lieutenant; the prisoner asked him to make the call, and he said he could not because his hands were tied; and the officer told the prisoner he would ask the officers on the next shift to keep an eye on him.

The right at issue for Decker and White (i.e., the compound officers) is identical except that: (1) they had only one interaction with the prisoner; (2) they conducted the tests of his arms and hands and told him he would be alright and just needed to rest; and (3) it was Decker who said he probably had Bell's Palsy.

The Court cannot conclude that there is existing Supreme Court or Third Circuit precedent, or a consensus in the Courts of Appeals, giving an officer fair warning that every reasonable official would have understood that he was violating Plaintiff's constitutional rights in such circumstances. Plaintiff does not argue that the Federal Defendants have failed to meet their burden under the second prong of the qualified immunity doctrine. In fact, he does not mention this "clearly established right" prong in his opposition.

While it is well settled that, as a general proposition, a failure to obtain immediate medical attention for a prisoner being medically treated who has a dire and obvious problem constitutes deliberate indifference, "our Court of Appeals held Mr. Spruill's condition, which included excruciating back pain causing him to collapse twice, was not so 'dire and obvious' to require the

prison official to summon immediate medical attention." *Roman v. Little*, Civ. No. 19-5204, 2020 WL 2098096, at *7 (E.D. Pa. Apr. 30, 2020) (quoting *Spruill*, 372 F.3d at 223-24, 237).

Instead of presenting binding precedent or a clear consensus, the case law regarding whether the sort of symptoms at issue here "obviously" showed that the person had a stroke or another health emergency requiring immediate medical attention is not clear or consistent. For instance, on the one hand, the United States District Court for the Eastern District of Missouri recently observed that, under Eighth Circuit case law, the decedent's medical need was not so obvious that even a layperson would recognize that an otherwise healthy man in his early 30s experiencing vomiting, headache, dizziness, and even unsteadiness was having a stroke. *Mitchell*, 2024 WL 1674521, at *4; *see also Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) ("While the record suggests they were less than sympathetic to Roberts's continuing illness, a corrections officer who disregards visible and self-reported symptoms that medical professionals believe to be consistent with the flu [but were actually symptoms of a stroke] may be negligent, but he is not deliberately indifferent to an obvious need for immediate medical attention that is sufficient to establish a cognizable claim under the Eighth Amendment." (citation omitted)). On the other hand, according to a decision from the Eastern District of Michigan, a plaintiff raised a genuine issue of material fact as to whether the need for immediate medical treatment was obvious where the inmate described being unable to move for periods of 15-20 minutes, dizziness, stabbing pains in her head, neck, and shoulders, and blurred/impaired vision. *McConnell v. Sharpe*, Civ. No. 09-12603, 2011 WL 824680, at *4 (E.D. Mich. Feb. 3, 2011), *R&R adopted by* 2011 WL 824674 (E.D. Mich. Mar. 7, 2011); *see also Holland v. Macon State Prison*, Civ. No. 16-539, 2017 WL 4935878, at *3 (M.D. Ga. Apr. 21, 2017) (denying motion to dismiss where plaintiff alleged that he communicated his symptoms of a stroke or heart attack to non-medical prison official defendants and alleged facts

suggesting to a layperson that he was having a health emergency, e.g., he was not able to walk and pleaded with defendants to call an ambulance or obtain assistance, were sufficient to require further factual development), *R&R adopted by* 2011 WL 4931677 (M.D. Ga. Oct. 31, 2017).  Decker also told Plaintiff and the other inmates (and Harris and White) that he believed Plaintiff had Bell's Palsy, and not a stroke (Pl. Decl. ¶ 6), and there is no indication that Bell's Palsy constitutes a dire and obvious medical emergency under *Spruill*.

Under the circumstances, the Court concludes that the right allegedly violated by Harris, Decker, and White was not "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[8]  *Russell*, 31 F.4th at 737-38.

---

[8]    In *Conte v. Goodwin*, No. 19-08333, 2024 WL 3983086 (D.N.J. Aug. 29, 2024), this Court concluded that "it is clearly established that prison officials must provide prompt medical attention to a prisoner who is having a heart attack or similar medical crisis," *id.* at *15.  However, the decisions regarding the obvious (and dire) nature of the symptoms of a heart attack is generally clearer than their stroke counterparts.  For instance, this Court observed that, "[a]s explained [by the Tenth Circuit] in *Mata v. Saiz*, 'evidence presented to the district court support[ed] that conclusion that [Defendant] was in fact aware [Plaintiff] was suffering from severe chest pains and required medical attention' because Plaintiff 'personally reported as much to [Defendant].' 477 F.3d 745, 746 (10th Cir. 2005)."  *Conte*, 2024 WL 3983086, at *9.  Furthermore, the Sixth Circuit recognized that "[t]he symptoms of a heart attack are common knowledge even to laypersons."  *Id.* (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005)). However, the Tenth Circuit subsequently determined that a complaint, which alleged that the prisoner reported to the medical unit that he had numbness on the left side, slurred speech, and balance issues, and believed he had a stroke, "fails to plead sufficient facts to establish the stroke was 'so obvious that even a layman would recognize the problem.'"  *Foreman*, 796 F. App'x at 531-32 (further noting that defendant briefly examined the plaintiff, his vital signs were good, and she did not believe he had suffered a stroke); *see also Spencer v. Abbott*, 731 F. App'x 731, 745 (10th Cir. 2017) ("Rather, Mr. Maguire advances the view that Mr. Abbott [a physician's assistant] should have recognized his symptoms [partial loss of motor control] as being *more consistent* with a stroke [as opposed to a diagnosed muscle spasm], and submits that his failure to do so constitutes deliberate indifference.  We are not persuaded." (emphasis in original)).  Furthermore, *Conte* did not involve the application of the *Spruill* "obviously dire" exception for claims against non-medical prison officials.

IV.     **CONCLUSION**

For the foregoing reasons, the Federal Defendants' Motion is **GRANTED**.  An appropriate Order will be entered.

DATED:  November 26th, 2024

_____
GEORGETTE CASTNER
United States District Judge